BRYANT and another, Appellants, vs. PIERCE, Respondent.

95    331
113   512
113   ⁴679

*February 4 — February 23, 1897.*

*Will, contest of: Verdict in will case: Evidence: Testamentary capacity:*
*Undue influence.*

1. The verdict of a jury in a contest as to the probate of a will has substantially the same advisory effect as a verdict on a feigned issue in chancery, and consequently exceptions to the admission of testimony cannot work a reversal on appeal.
2. Evidence that during the last three or four years of the testator's life his manner of living and of doing business and his habits in some other respects had materially changed, and he had associated with immoral women, sustains a verdict that he had not mental capacity to make a valid will.
3. An impaired and enfeebled condition of mind renders a person more susceptible to undue influence, and where a will is contested on that ground, the prior and subsequent declarations of the testator are admissible in evidence to prove or disprove his capacity to discover and resist importunities, flatteries, or other acts tending to unduly influence him. The previous relations, friendships, and intercourse between the testator and the several parties concerned, and the physical and mental condition of the testator, may be shown, as well as the circumstances under which the will was executed.
4. A judgment denying probate of a will because of the mental incapacity of the testator and of undue influence, found by both court and jury upon sufficient evidence, will not be disturbed on appeal.

APPEAL from a judgment of the circuit court for La Crosse county: O. B. WYMAN, Circuit Judge. *Affirmed.*

This is an appeal from a judgment refusing to admit to probate a paper writing dated March 24, 1893, purport-

ing to be the last will and testament of George H. Pierce, deceased. It appears from the record: That the deceased was born in Massachusetts, June 17, 1829. That he was a machinist by trade. That he married and moved to Boston. That January 3, 1853, his first child, the contestant herein, was born. That in the spring of 1858 the deceased came west, and settled at Warren, Illinois. That his wife and child followed in the fall of 1858. That in 1859 they moved to Mineral Point. That he became a master mechanic at that place. That they continued to live at Mineral Point until 1873, when he separated from his wife, and with his three children moved to La Crosse, and bought a sash, door, and blind factory. That he had in all four children by his first wife, to wit: Lucy, born August 15, 1860, and who married, but died March 17, 1881, without issue; Gertie, born in 1866, and who married in June, 1888, and died December 26, 1892, without issue; and Wilbor, who was born and died at Mineral Point, when about seven years of age; and the contestant, who was nearly of age when he moved to La Crosse. That the contestant, *Frank A.*, worked for his father until after he became of age, in 1874, and then went to Chicago, where he was married November 6, 1875, and the next year he and his wife went to California, where he remained until 1880, when he visited his father, at his request. That during all that time he had kept up a friendly correspondence with his father and mother. That in the meantime he had become the father of four children. That after the deceased had lived separate and apart from the mother of his children five years or more, and some time prior to 1880, they were divorced, in a suit brought by the wife. That about that time the deceased married a second wife, with whom he lived until June, 1888, when she died. That Mr. Granke, father of the sole legatee and devisee, died October 10, 1890. That he was a saloon keeper, and used to work for the deceased. That at the time of his death he owned

property on Rose street and Caledonia street. That after his death his widow, Mrs. Granke, rented the saloon property on Rose street to Hattie Lovejoy for a millinery store, and part of the time lived upstairs with her family over the store, and part of the time on Caledonia street. That the deceased was first known to go with any of Mrs. Granke's family in February, 1892, when he took Tillie, her youngest daughter, to the theater. That he went with her some from that time until the Granke family moved to Chicago, in May, 1892. That Tillle got married July 13, 1892. That the deceased went with *Miss Adeline M. Granke* some in the winter of 1892–93. That a witness, Dunlap, who was in the testator's office in 1892, testifies that sometime in the late summer or early fall of 1892 he opened a letter addressed to the deceased, written by *Adeline*, from Chicago, and gives the substance of it from memory, to the effect that she said to him: "I hope you will excuse me, a stranger, for addressing such a letter to you. I hope you will excuse Tillie for what she has done. You know she is young and giddy." He then said: "It went on, and asked if she could not, in effect, take Tillie's place." He said again: "It was a two-page letter. It was simply palaver and formal. I cannot tell you what it was. It was simply this, in numerous words: 'Will you consider me in Tillie's place?'" That March 24, 1893, the testator went alone to the office of his attorney, and caused to be drawn up, and then and there executed, the instrument here in dispute, and which instrument is to the effect that, after the payment of his just debts and funeral expenses, he gave, devised, and bequeathed unto *Miss Adeline M. Granke*, of La Crosse, all the rest, residue, and remainder of his estate, both real, personal, and mixed. That said instrument also contained this provision: "(2) I have heretofore given to and expended for my son *Frank Allen Pierce* a sufficient sum. I have not seen or heard from him in many years, and do not even know that

he is alive, but, in the event of his being alive, I make no provision for him." That this instrument was duly attested in the presence of two subscribing witnesses, and is in all respects the same as the will executed by him December 23, 1892, being three days before the death of his daughter Gertie, except that he had bequeathed therein to Gertie a legacy of $500. That just prior to the will of December 23, 1892, he had been quite sick. That June 15, 1893, the deceased conveyed to *Miss Adeline M. Granke* lots 2 and 3, block 13, of the original plat of the village of North La Crosse, recorded July 17, 1893, reciting a consideration of $1,100. That June 19, 1893, the deceased was secretly married to *Adeline M. Granke*. That July 31, 1893, the deceased and *Adeline M.*, his wife, conveyed the same lots to *Benjamin F. Bryant*, reciting a consideration of $5,000, and the same was recorded August 2, 1893. That July 31, 1893, *Benjamin F. Bryant* conveyed, by quitclaim deed, to *Mrs. Adeline M. Pierce*, the same premises, reciting a consideration of $5,500, and the same was recorded August 2, 1893. That February 9, 1894, the alleged testator died, leaving an estate which the contestant claims to be of the value of $25,000. That August 13, 1894, the will of March 24, 1893, was admitted to probate in the county court after a contest.

The contestant having appealed from that judgment to the circuit court, the case was retried, and at the close of the trial the jury returned a special verdict, to the effect (1) that the will of George H. Pierce in controversy was made, signed, witnessed, and executed in due form of law; (2) that said George H. Pierce, March 24, 1893, when the proposed will was made, was not of sound and disposing mind and memory; (3) that George H. Pierce, at the time of making said will, was under undue or improper influence on the part of *Adeline M. Granke*, Caroline Granke (the mother), Clara Granke, and Tillie Granke, or one or two of

said persons, which influenced said Pierce to make the proposed will.   Upon that verdict, the contestant duly moved for judgment disallowing the probate of the instrument as the last will of said George H. Pierce, deceased; and the proponent duly made his motion that the court disregard said verdict, and find in favor of the proponent upon all the issues submitted in this case, and upon such finding admit to probate said instrument, propounded as the last will and testament of said George H. Pierce, deceased, or else set aside the verdict, and grant a new trial.

After stating certain things which tended to show the mental capacity of the deceased at the time of making the alleged will, and that it was not procured by undue influence, the trial court, among other things, expressed the following opinion:

"On the other hand, there are many circumstances in this case which tend to support the contention of the contestant on these two propositions. . . . The whole life of the deceased has been before the court, in a measure, by the testimony in this case; and it clearly appears that his manner of living and his manner of doing business and his habits in some respects were materially different during the last two or three years of his life than they had been before, while he was a resident of this city. His associations, to say the least, were peculiar, and the evidence tends to show that he associated with people of questionable repute; and the testimony tends to show that the management and care of his entire property was essentially different in the past two or three years of his life than it was before.   This question was submitted to the jury, and the jury in this case have found that these changes in the method of doing business, and changes in the character of his associates, show, from the facts and circumstances in this case, that he was not in his usual sane mind.   The evidence on this point is conflicting.   There is evidence which, if taken as true and consid-

Bryant and another vs. Pierce.

ered as true, certainly establishes the proposition that he was of sufficient mind and disposing memory to make a valid will, and there is other evidence in this case which, if true, is sufficient to support the contention of the contestant in this case that he was not of sufficient mental capacity to make a valid will at this time. The controversy and this dispute upon the evidence in this case was submitted to the jury.

"The case was quite carefully tried, fully considered, ably argued, and the jury, in passing upon this matter, have found, as a matter of fact, that he was not of sufficiently sound mind and disposing memory at the time this will was made to make a valid will. And the question now comes as to whether the court shall disregard this finding of the jury, and set this finding aside on this controverted question, and declare and decree that he was of sufficient mental capacity to make a valid will at that time. . . . In view of this contradictory testimony, the court is inclined to think, and the judgment of the court is, that the verdict of the jury should be respected, and that the court should be guided, in a measure, as far as the facts are concerned, by the determination of twelve jurors upon this controverted part of the testimony.

"Further, as to the question of undue and improper influence on the part of *Miss Granke:* This is one of the important features of this case. Taking any part of the testimony alone, the court is unable to say that any single circumstance of itself is sufficient to support the finding of the jury that there was undue influence exerted upon Mr. Pierce at the time this will was made. But there are many circumstances which tend to show that there might be undue influence, and the jury have found, from all the evidence in this case, and from the circumstances that were shown on the trial by several witnesses,— taking these circumstances together,— they formed the opinion, and so expressed it in

their verdict, that there was such undue influence exerted upon Mr. Pierce at this time by *Miss Granke* that it was not the will of Mr. Pierce, but was the will of *Miss Granke,* that was made on the 24th of March, 1893, by the deceased. On this branch of the case there is plenty of evidence which supports the finding, and there is evidence which, if true, supports the proposition contended for by the contestant in this case; and on this controverted part of the evidence the jury have found, as a matter of fact, that she did exercise such undue influence upon the deceased that this instrument was not the instrument of the deceased, but was rather her will and her request, and that the influence was undue. So that the judgment of the court is that this finding of the jury on this controverted evidence should be respected by the court, and that this finding should aid the court in determining what the fact is in this case; and, guided by the verdict of the jury, the court is of the opinion that the verdict of the jury shall be adopted and considered by the court as the finding of the court upon these two motions; and, as such, the motion of the contestant will be granted in this case, that the probating of the will be refused, and the probating of the will be disallowed; that judgment be rendered that the proposed will be declared not the proposed will and testament of the deceased."

From the judgment entered pursuant to the verdict and the findings of the court, the proponent and the legatee named in the will bring this appeal.

For the appellants there was a brief by *Losey & Woodward,* and oral argument by *B. F. Bryant* and *G. M. Woodward.* They contended that there was no affirmative evidence of undue influence, and that evidence of the reputation of the sole legatee for chastity was improper and did not tend to prove undue influence. That such influence will be presumed when parties live in immoral relations is not the law. *Main v. Ryder,* 84 Pa. St. 217, 225; *Wainwright's*

*Appeal*, 89 id. 220; *Heilbrun's Estate*, 9 Pa. Co. Ct. R. 350. That fact may be considered only in connection with affirmative evidence. *Matter of Mondorf's Will*, 110 N. Y. 450, 456; *Kessinger v. Kessinger*, 37 Ind. 340; *Monroe v. Barclay*, 17 Ohio St. 302, 314, 317; *Davis v. Calvert*, 5 Gill & J. 269; *McClure v. McClure*, 86 Tenn. 173. The admission of testimony as to the habits, conduct, and bearing of the testator, and of his declarations was improper. So, also, was the refusal to allow a physician to testify as to his sanity. *Fraser v. Jennison*, 42 Mich. 209, 224; *Denning v. Butcher*, 91 Iowa, 425; *Will of Jenkins*, 43 Wis. 610.

For the respondent there were separate briefs by *Winter*, *Esch & Winter* and *Bleekman, Bloomingdale & Bergh*, and oral argument by *A. E. Bleekman* and *F. Winter*.

CASSODAY, C. J. A general outline of the facts in the case and a considerable portion of the opinion of the trial court have been given. The testimony is voluminous. Several exceptions are taken to the admissions of testimony. Assuming that some of the exceptions are well taken, yet, as the verdict in such a case has substantially the same effect as a verdict on a feigned issue in chancery, it is manifest that such exceptions cannot work a reversal. *In re Jackman's Will*, 26 Wis. 104; *Chafin Will Case*, 32 Wis. 557, 569; *Wright v. Jackson*, 59 Wis. 584; *Loughney v. Loughney*, 87 Wis. 101. This is the well-settled rule in equity cases. The rule is recognized by counsel for the appellants, for they say that they make these assignments of error "simply as the most convenient way of exhibiting to this court the peculiarities of the trial, and the circumstances under which the court reached its conclusions," and "that this court will pass upon the whole record, and, excluding improper testimony from consideration, will determine whether the judgment is to stand." The declarations of the deceased were certainly competent evidence on the subject of his mental capacity.

Upon the question of the mental capacity of the deceased, the trial court, among other things, in effect said that, during the last two or three years of his life, his manner of living and his manner of doing business and his habits in some respects were materially different than previously. Such changes are frequently evidence of impaired and enfeebled intellectual faculties, which are liable to end in mental decay and idiocy. The trial court, upon this point, further said: "There is evidence which, if taken as true and considered as true, certainly establishes the proposition that he was of sufficient mind and disposing memory to make a valid will, and there is other evidence in this case which, if true, is sufficient to support the contention of the contestant in this case that he was not of sufficient mental capacity to make a valid will at this time." Consequently, the court acquiesced in the verdict of the jury, and held that the deceased did not have the mental capacity to make a valid will at the time the instrument in question was executed. We have grave doubt as to this conclusion from the evidence upon the mere question of the mental capacity of the deceased to make a valid will had no undue influence been brought to bear upon him. But such impaired and enfeebled condition of his mind necessarily made him more susceptible to such influence. It is upon this theory that prior and subsequent declarations of the testator are admissible in evidence on the question of undue influence. True, such declarations are not evidence that extraneous and undue influence was actually exerted, but were to prove or disprove the capacity of the testator to discover and resist importunities, flatteries, or other acts tending to undue influence. The weaker or more susceptible the mind of the testator, the less artifice will be required to mislead, pervert, or deceive it. As said in another case, undue influence "is a subtle species of fraud, whereby mastery is obtained over the mind of the victim by insidious approaches, seductive artifices, or other species

of circumvention. From the very nature of such influence, the evidence, generally, is wholly or almost wholly circumstantial. The questions to be considered are not confined to the conduct of the favored legatee and his friends, constituting the alleged undue influence, but extend to the susceptibility of the testator to the peculiar influences brought to bear upon him, and his capacity to discover and resist such approaches and importunities. The previous relations, friendships, and intercourse between the testator and the several parties concerned, and the physical and mental conditions of the testator, therefore, as well as the circumstances under which the will was executed, are important to be considered." *Will of Slinger,* 72 Wis. 27. The brief of counsel for the proponent and legatee concedes that "some of the testimony given on both sides tends to show that the testator was habitually loose and immoral in his relation with women. It also appears that for several years before his death he was troubled with disease of the bladder and urinary organs, from which at different times he suffered intensely, and that he was very emotional." When passion has the mastery, the intellectual faculties are naturally weakened, and the judgment and power of volition impaired. Especially is this true when the victim has a disease which stimulates the passion. It can serve no purpose to recite evidence on this question. The trial court said: " His associations, to say the least, were peculiar, and the evidence tends to show that he associated with people of questionable repute;" and further said that the jury "formed the opinion, and so expressed it in their verdict, that there was such undue influence exerted upon Mr. Pierce at this time by *Miss Granke* that it was not the will of Mr. Pierce, but the will of *Miss Granke,* that was made on the 24th day of March, 1893, by the deceased. On this branch of the case there is plenty of evidence which supports the finding, and there is evidence which, if true, supports the proposi-

Bryant and another vs. Pierce.

tion contended for by the contestant in this case; and on
this controverted part of the evidence the jury have found,
as a matter of fact, that she did exercise such undue in-
fluence upon the deceased that this instrument was not the
instrument of the deceased, but was rather her will and her
request, and that the influence was undue." And so the
finding of the jury upon that question · is adopted as the
finding of the court. It is to be remembered that "the
influence of an unlawful relationship is naturally and ordi-
narily unlawful, in so far as it respects testamentary dispo-
sitions favorable to the unlawful relationship, and unfavor-
able to the lawful heir. This was so held in a case where
the testator was living in adulterous intercourse with the
mother of the beneficiaries. *Dean v. Negley*, 41 Pa. St. 312.
This is somewhat similar in principle to the case at bar."
*Will of Slinger*, 72 Wis. 35. See, also, *Leighton v. Orr*, 44
Iowa, 679. We do not feel justified in disturbing the finding
of the fact of undue influence, thus sanctioned by both the
court and the jury. They certainly had far better opportu-
nities for weighing the evidence, and rendering an accurate
conclusion as to the facts, than this court; and, after care-
ful consideration, we are constrained to follow and sanction
their judgment. *Moore v. McDonald*, 68 Md. 321.

The error assigned for excluding a portion of the testi-
mony of the physician who attended the deceased, by reason
of the provisions of sec. 4075, R. S., must be overruled, for
the reasons given in an opinion filed herewith by Mr. Justice
PINNEY, in *Boyle v. N. W. Mut. R. Asso., ante*, p. 312. Other
errors are assigned, but it is believed that they are substan-
tially covered by what has already been said.

*By the Court.*— The judgment of the circuit court is af-
firmed.

On March 24, 1897, on motion of the appellants, an order
was entered making the taxable costs of both parties in this
court payable out of the estate.